# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JUNIOR JUMPP HOLNESS,
*Plaintiff*,

v.

No. 3:18-cv-01752 (JAM)

GERARD GAGNE, *et al.*,
*Defendants*.

## INITIAL REVIEW ORDER RE AMENDED COMPLAINT
## PURSUANT TO 28 U.S.C. § 1915A

Plaintiff Junior Jumpp Holness is in the custody of the Connecticut Department of Correction ("DOC"). He has filed an amended complaint *pro se* and *in forma pauperis* seeking relief against numerous prison officials under 42 U.S.C. § 1983. After an initial review of the amended complaint pursuant to 28 U.S.C. § 1915A, I conclude that his claims may proceed against some of the named defendants and shall be dismissed as to the other named defendants.

### BACKGROUND

Holness initially filed this action on October 23, 2018. Doc. #1. I issued an initial review order on April 24, 2019. Doc. #9; *Holness v. Gagne*, 2019 WL 1789907 (D. Conn. 2019). Holness has now filed an amended complaint, Doc. #47, which is the subject of this additional initial review order.

Holness names twenty-five defendants in his amended complaint: Gerard G. Gagne, Jr., MD, and Richard B. Fisher, DDS; dental assistant Sandra Menders; RNs Janine M. Brennan, Beth A. Shaw, Stephanie H. Fraser, Nikia M. Henderson, and Kayla Lozada; nursing supervisor Kara J. Phillips; APRN Margaret Wallace; CN James Peek; CNS Diane Fritz; wardens Stephen Faucher and Anthony Corcella; deputy warden Ronald Cotta; Lts. Koniecko and Nichols;

1

correction officer Savoie; director of psychiatric services Craig Burns; LPCs Michele J. Binezewski and Stacy Torpey; LCSWs Patricia G. Placido and Matthew N. Eggen; FOIA liaison Wright; and counselor Michelle King.[1] All except Burns, who works for the DOC, allegedly work at Corrigan-Radgowski Correctional Center ("Corrigan"). Doc. #47 at 2-5.

Like Holness's original complaint, this filing, while labeled a single amended complaint, actually contains two factual sections. The first section, *id.* at 6-11, recounts verbatim allegations from his original complaint about incidents at Corrigan in fall 2018, Doc. #1 at 5-10. The second section, which begins at paragraph one again, alleges incidents at Corrigan in spring 2019. Doc. #47 at 12-19. Holness seeks monetary damages from the defendants in their individual capacities and injunctive relief from the defendants in their official capacities in the form of appropriate medical, mental health, and dental treatment. *Id.* at 1, 20.

Holness has also filed a motion for preliminary injunctive relief, Doc. #59, alleging violations of his rights that occurred in summer 2019.

### Fall 2018

The first section of the amended complaint realleges from Holness's original complaint incidents that occurred at Corrigan in September and October 2018. Pursuant to its first initial review order, the Court permitted Holness's claim for damages and equitable relief to go forward against Gagne, Brennan, Faucher, and Burns. *See Holness*, 2019 WL 1789907 at *1-*2.[2]

---

[1] The amended complaint does not include the first names of four of the defendants.
[2] In the previous initial review order, I found that the claims in the second, third, and fourth factual sections of Holness's complaint were within the scope of the three-strikes provision of 28 U.S.C. § 1915(g) and would be subject to dismissal unless Holness paid the required filing fee within twenty-one days. Because Holness did not pay the filing fee within the time specified, those claims are dismissed.

*Spring 2019*

The second section of the amended complaint further alleges the following facts, which I accept as true for purposes of this initial review.

On March 15, 2019, Holness was transferred from Hartford Correctional Center back to Corrigan, where he is currently held. Doc. #47 at 12. On March 26, April 15, May 23, and May 25, Holness wrote to Dr. Fisher, a dentist, and his assistant Menders requesting immediate treatment of his chronic tooth pain, for which he had been on the dental waiting list since 2018, as well as treatment of his tooth filling, which recently had fallen out and caused bleeding. *Ibid.* Each time, Fisher and Menders told him that he was still on the waiting list. *Ibid.* Holness still had not been seen by the time he filed his amended complaint in June 2019. *Ibid.*

On May 3, Holness reported chest pain to a correction officer and Lt. Koniecko. *Id.* at 13. After Koniecko told Holness he "was not going to be seen by medical" and the two briefly argued, he and the correction officer escorted Holness to medical services, where RNs Fraser and Henderson evaluated him. *Ibid.* After Holness told them that he had been "[constantly] hearing voices telling me to do stuff" and "had swallowed a [sharp] blade," they called mental health services. *Ibid.* Holness then saw LPC Binezewski, who told him that he would "get nothing from mental health because he's suing Dr. Gagne, [who] told [mental health staff] not to give [Holness] anything." *Ibid.* Upon learning of Holness's suicidal thoughts, Binezewski said she would place him on behavioral observation status (BOS) rather than suicide watch, and that he would not "get any hot meal," but instead "all bag meal[s,] cold bologna [for] all meals." *Ibid.*

Holness was subsequently placed in a restrictive housing unit (RHU) and strapped to the bed for hours. *Ibid.* While he kept telling nurses Fraser, Henderson, Lozada, and Peek, who checked on him every fifteen minutes, that he "was in pain in the belly area due to the

swallowing of that sharp blade," they ignored his requests for an x-ray or transfer to the hospital, and gave him nothing to ease the pain. *Id.* at 13-14. When Lozada asked Holness what he had swallowed, correction officer Savoie mocked, "[H]e swallowed my cock." *Id.* at 14. APRN Wallace, the attending clinician, was told about the nurses' indifference to Holness's pain, but did nothing. *Ibid.* Lts. Koniecko and Nichols were told about his pain and Savoie's misconduct, but also did nothing. *Ibid.* Nichols brought Holness a sandwich with a piece of hair in it. *Ibid.*

On May 4, when Holness told LCSW Eggen about his suicidal thoughts and asked for help, Eggen replied before walking off, "Mr. Jumpp, I think[] that's your best idea right now. Do everyone here a favor [and] kill yourself. You['re] a [fucking] piece of shit." *Id.* at 15. Holness then told Savoie that there was blood in his feces and that he needed medical attention, to which Savoie replied, "You['re] not getting shit. Kill yourself, [scum] bag." *Ibid.*

Holness was released from the RHU on May 6. *Ibid.* In the two weeks following May 10, he made several written requests to nursing supervisors concerning the lack of medical attention during his confinement as well as his ongoing pain and bleeding, which were answered by nursing supervisor Fritz. *Id* at 15-16. In the meantime, from May 10 to May 15, Holness thrice wrote to FOIA liaison Wright requesting video preservation of incidents on May 3 through May 6, among others. *Id.* at 19. Wright denied those requests. *Ibid.*

On May 15, Holness was seen by APRN Wallace, who ordered an x-ray and "[Maalox] liquid" for him, but not pain medication. *Id.* at 16. Later that day, Holness told CNS Fritz about his pain, to which she replied, "You['re] suing one of mine, Dr. Gagne, right? So, I am not going to do anything to help you or get you up to medical." *Ibid.* Holness had an abdominal x-ray on May 16 that showed the swallowed blade in his stomach, but medical staff refused to treat him or send him to the hospital for surgery. *Ibid.*

On May 17, Holness was again placed in an RHU for having suicidal thoughts, although Eggen put him on BOS instead of suicide watch. *Id.* at 18. The next day, LPC Torpey came to see Holness after learning that he had been banging his head against a window and wall, and was bleeding. *Ibid.* Holness told Torpey that "the voice" kept telling him to kill himself. *Ibid.* She replied, "I am not going to do anything for you, because I am not a doctor. You are hit [*sic*] until Monday [May 20]." *Ibid.*

A second x-ray on May 21 showed the blade had "passed," but Holness still bled when passing stools. *Id.* at 16. He wrote to medical services on May 23 requesting to be seen for said bleeding and stomach pain. *Id.* at 17. On May 24, Holness told nursing supervisor Phillips that he was "in chronic pain and still bleeding a little" and that he had "been on [the] sick call list since March 2019" but had never been seen. *Ibid.* Phillips replied before walking off, "You [are] right, and [there's] a reason [for] that. Also, you will never get seen. You [will] get[] nothing. Mr. Jumpp, kill yourself." *Ibid.* On May 23 and 24, Holness also complained to warden Corcella and deputy warden Cotta about all the mistreatment he had received, to which they replied, "Dude, you['re] suing . . . Dr. Gagne. What do you expect?" *Id.* at 19.

On May 26 or 27, Holness told RN Shaw that he needed his inhaler. *Id.* at 17. Shaw told Holness that he would get nothing. *Ibid.* Without an inhaler, Holness had to use his sleep apnea machine ("CPAP") to ease the tightness in his chest. *Ibid.*

On May 28, when LCSW Placido and LPC Torpey were told about Holness's continuing suicidal thoughts, they told the correction officer at his cell, "Call us back if he hang[s] up [*sic*]. We [are] not going to do anything until [he] actually carries out such." *Id.* at 18. The same day, mental health counselor King told Holness that he needs to "grieve stuff" because she is "not

going to process [his] stuff." *Ibid.* King also said, "You get[] nothing. So, you can stop. And the next time [you] try to kill [your]self, [you] should actually be successful on doing this." *Ibid.*

### Summer 2019

On July 17, 2019, Holness filed a motion for preliminary injunctive relief, Doc. #59, alleging the following facts.

On July 11, correction officer Wright "influenced" another correction officer to "shake down" Holness's cell, during which the officer ripped up Holness's family photos. *Id.* at 2. Afterwards, when Wright and two correction officers came to escort Holness back to his cell from the recreation yard, Wright told Holness that "he was going to leave his handcuffs on loosely, so he could come out of them and allow him to engage in a physical fist fight with them." *Ibid.* Wright did handcuff him loosely. *Ibid.* Holness, carried away by his known mental health problems, grabbed an extension cord and swung at the officers, injuring none. *Ibid.* As all three officers took Holness down to the floor, Wright grabbed and tried to break his finger. *Ibid.* Holness was transported to UConn Hospital the next morning. *Ibid.* RN Henderson ordered an x-ray of Holness's right hand and gave him Ibuprofen due to right-digit swelling. Doc. #64 at 6.

Despite the July 11 incident, warden Corcella assigned the same officers to Holness's unit on July 16. Doc. #59 at 3. During his evening tour, Wright told Holness "it's not over," leaving him in fear of being assaulted or framed. *Ibid.* The officers also took away Holness's CPAP, telling him they were told to do so in an email from the Attorney General's office. *Ibid.* In an attached response to one of Holness's grievances, a prison official concedes that the Attorney General authorized the daily removal of his CPAP from 10:00 a.m. to 10:00 p.m. *Id.* at 5.

DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the compliant, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

**In forma pauperis** *status*

As discussed in my prior initial review order, Holness has previously filed multiple meritless actions while incarcerated, such that he is subject to the "three strikes" limitation of 28 U.S.C. § 1915(g), which allows Holness to proceed *in forma pauperis* only if he alleges imminent danger of serious physical injury. *See Holness*, 2019 WL 1789907 at *3-*4. I ruled that the part of Holness's original complaint that pertains to the alleged incidents in fall 2018 (*i.e.*, the first factual section of the amended complaint) appeared to qualify for the imminent danger exception to the three-strikes rule, and hence would be provisionally allowed to proceed

7

*in forma pauperis*. I now conclude similarly that the second factual section of the amended complaint alleges ongoing deliberate indifference to Holness's serious medical needs, including chronic tooth pain and rectal bleeding, such that he sufficiently alleges imminent danger of serious physical injury.

Holness now also appears to allege that he was denied a meal, excessive force was used in restraining him, his FOIA requests were wrongfully denied, and there is a conspiracy to deny him evidence. Although these claims do not involve imminent physical danger, I will address them in light of the Second Circuit's holding that a prisoner may proceed *in forma pauperis* as to all claims in his complaint if any one claim qualifies for the imminent danger exception. *See Chavis v. Chappius*, 618 F.3d 162, 171-72 (2d Cir. 2010). If defendants believe that there is no basis for a finding of imminent danger of serious physical injury, they may promptly file a motion for reconsideration of the Court's grant of *in forma pauperis* status along with appropriate evidentiary materials. *See Shepherd v. Annucci*, 921 F.3d 89, 94-96 (2d Cir. 2019).

### *Deliberate indifference to serious medical need*

Because the record is unclear whether Holness is a pretrial detainee or sentenced prisoner, I will assume for now that he was a pretrial detainee at all relevant times and analyze his claims under the rubric of the Fourteenth Amendment's Due Process Clause rather than under the more demanding requirements that apply under the Eighth Amendment for claims brought by sentenced prisoners.

A deliberate indifference claim under the Fourteenth Amendment has two requirements. The objective prong requires a pretrial detainee to show that the medical need was "sufficiently serious" to warrant the need for treatment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). A "sufficiently serious" need is an urgent medical condition that is capable of causing

death, degeneration, or extreme or chronic pain. *See Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). The subjective prong requires the detainee to further show that the official acted with at least deliberate indifference (whether in terms of what he actually knew or what he should have known) with respect to furnishing the needed treatment. *See Darnell*, 849 F.3d at 29. Thus, if the medical condition is sufficiently serious to warrant treatment, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.

In my previous initial review order, I concluded that given Holness's diagnoses of schizophrenia, PTSD, and emotional distress, as well as the allegation that he had passed out due to breathing issues, both the denial of his psychiatric medication and the delay or interruption in the treatment of his breathing problems were sufficiently serious to meet the objective prong of the test for deliberate indifference to serious medical need. *See Holness*, 2019 WL 1789907, at *6.

The second section of the amended complaint alleges four more medical needs that are sufficiently serious to meet the objective prong. Holness's alleged swallowing of a sharp blade in May, which resulted in a period of abdominal pain and rectal bleeding, was obviously a serious medical condition that deserved to be treated at the time. *See Petty v. City of New Britain*, 2018 WL 587321, at *3 (D. Conn. 2018) (rectal bleeding is a serious medical need). His banging of his head against a window and wall, and the resultant bleeding, was also sufficiently serious. *See Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017) (a prisoner banging his head against a door

for eight hours is a serious medical need). So too are Holness's dental needs, including both the chronic tooth pain for which he has been on the waiting list for about a year, and the more recent falling out of his tooth filling and the resultant pain and bleeding. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (pain from lack of treatment can be a serious medical need); *Jones v. Rock*, 2013 WL 4804500, at *22 (N.D.N.Y. 2013) (allegation that inmate "suffered from extreme pain and an inability to eat or sleep properly as a result of the lost filling" constituted "plausible showing that [inmate] suffered from a serious dental condition"). Lastly, Holness's suicidal thoughts, paired with his mental illnesses, are sufficiently serious medical needs. *See Young v. Choinski*, 15 F. Supp. 3d 194, 204 n.10 (D. Conn. 2014) (collecting cases).

I will analyze the subjective prong separately for each named defendant.

### *Gagne, Brennan, Burns, and Faucher*

In my previous initial review order, I ruled that Holness had stated a claim against Gagne, Brennan, and Burns as to the denial of psychiatric medication, and against Faucher for lack of access to his breath pump in fall 2018. *See Holness*, 2019 WL 1789907 at *6. That ruling still stands, as the first section of the amended complaint reasserts the original allegations.

In the second section of the amended complaint, Holness does not allege new facts about Brennan, Faucher, or Burns. But he does newly allege that Gagne told mental health staff not to give him proper treatment for his suicidal voices in retaliation for filing this lawsuit. This is an additional fact to support Holness's claim against Gagne for deliberate indifference to a serious medical need, and sufficiently demonstrates recklessness if not intent on the part of Gagne.

### *Fisher and Menders*

Holness alleges that, since 2018, he has been on the dental waiting list without being seen or treated for his chronic pain. He further alleges that, since March 2019, he has made repeated

requests to Fisher and Menders for expedited treatment of his worsening dental conditions to no avail. In responses to grievances filed by Holness, prison officials stated that Holness first complained in September 2018 and that dental staff saw him in October 2018, did not see him while he was housed outside of Corrigan from November 2018 to March 2019, attempted to see him on April 24 but did not because he was in court, and attempted to see him on May 1 but did not because of "movement issues." Doc. #47 at 88, 90, 109. Construing Holness's amended complaint liberally, to the extent that he was seen in October 2018, Doc. #50 at 26, he was not sufficiently treated for his pain. Even assuming Fisher and Menders could not have treated Holness while he was away from Corrigan, they could have treated him from September to November 2018, and then from March to June 2019, but did not. Although Fisher and Menders were aware of the nine- to ten-month delay in treatment from Holness's longstanding presence on the dental waiting list, they permitted him to remain on it despite his repeated complaints of pain and loss of sleep, at least one of which was received in April 2019 by someone with initials of "SM," whom I take to be Menders. Doc. #47 at 86-90. Such a delay permits an inference of deliberate indifference. *See Harrison v. Barkley*, 219 F.3d 132, 138 (2d Cir. 2000) ("a one-year delay in treating a cavity can evidence deliberate indifference on the part of prison officials"). Holness has stated a claim of deliberate indifference against Fisher and Menders as to his chronic dental pain.

As to Holness's need for treatment in connection with a lost filling, he first raised this issue in late March 2019 such that only two-and-a-half months had passed without treatment by the time he filed his amended complaint. Even assuming Fisher and Menders made no effort to treat Holness during that time, he alleges no intentional acts on their part. All I am left with, then, is an allegation of delay. Normally, a two-and-a-half-month delay in receiving dental care is

insufficient to infer deliberate indifference. *See Glover v. Greenman*, 2013 WL 1294698, at *9 (S.D.N.Y. 2013). But because Holness alleges, along with statements that appear in grievance forms attached to his complaint, that Fisher and Menders were aware that the lost filling was causing him considerable pain and resultant loss of sleep, I find that he has adequately pleaded deliberate indifference. *See Jones*, 2013 WL 4804500, at *23; *see also Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (three-week delay in dental care plus knowledge of inmate's suffering can show deliberate indifference). Holness's claims for deliberate indifference against Fisher and Menders on this basis may also proceed.

### *Binezewski, Eggen, Torpey, Placido, and King*

Holness alleges that Binezewski, upon learning of his suicidal thoughts on May 3, placed Holness on BOS instead of suicide watch, and that she did so out of retaliation for Holness suing Gagne. But it is unclear from the amended complaint how being placed on BOS failed to mitigate the risk posed by Holness's mental health condition to his health or safety. BOS requires that prisoners be placed in units where staff routinely conduct 15-minute tours. *See* DOC Administrative Directive 9.4(17)(D) (eff. June 16, 2016), https://portal.ct.gov/DOC/AD/AD-Chapter-9 (last visited Dec. 6, 2019). There is no deliberate indifference when officials check on suicidal inmates every ten minutes. *See Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009); *see also Brown v. Semple*, 2017 WL 4246776, at *10 (D. Conn. 2017) (no deliberate indifference when placing prisoner on BOS for his protection). To the extent that Holness intends to state a claim for deliberate indifference to serious medical need (as opposed to retaliation) against Binezewski, his claim is dismissed. For the same reason, any deliberate indifference claim against Eggen for putting Holness on BOS on May 17 is dismissed.

I read the allegation that Binezewski told Holness on May 3 that he would "get nothing from mental health" because of his lawsuit against Gagne to mean he would not get psychiatric medication. But Binezewski, as an LPC, cannot prescribe medication in Connecticut. *See* Conn. Gen. Stat. § 20-195aa *et seq.* Because Binezewski was in no position to prescribe medication, and Holness has alleged no other facts giving rise to plausible deliberate indifference claims on this basis against her, I dismiss all such claims against Binezewski.

The allegation that Eggen ignored Holness's plea for help with his suicidal thoughts on May 4 is not plausible. Holness admits he was on BOS at the time, which would have made it difficult for him to kill himself as Eggen allegedly told him to do. Additionally, two medical records attached to the amended complaint show that Eggen assessed Holness on May 4 and May 5 and, although he found Holness did not exhibit any overt signs of acute mental illness, ordered *continued* BOS—an apparent exercise in caution and hardly the behavior of someone who wanted Holness dead. Doc. #47 at 39-42. Indeed, Holness alleges that he was not released from BOS until May 6. Because Holness has alleged no other facts giving rise to plausible deliberate indifference claims against Eggen, I dismiss all such claims against him.

The allegations that, though conscious of the serious risks to Holness's health, Torpey, Placido, and King refused to help Holness with his suicidal thoughts on May 28 but instead egged him on, and that Torpey refused to get treatment for Holness's bleeding head on May 17, plausibly raise deliberate indifference claims and may proceed.

### Fraser, Henderson, Lozada, Peek, Wallace, Fritz, and Phillips

Holness alleges that, from May 3 to May 6, nurses Fraser, Henderson, Lozada, and Peek, as well as attending APRN Wallace, were all told about his swallowing of a sharp blade or the resultant pain and bleeding, but did nothing; that although Wallace ordered an x-ray and Maalox

13

liquid on May 15, she prescribed no medication to relieve his abdominal pain; and that nursing supervisors Fritz and Phillips ignored his reported pain and bleeding. These allegations are broadly supported by medical records attached to the amended complaint. APRN Wallace assessed Holness on May 15, nearly two weeks after he first reported swallowing a blade. Doc. #47 at 100-03. A radiology report suggests a foreign body was present in an x-ray of Holness's abdomen on May 16, but was no longer present in a comparison x-ray taken on May 21. *Id.* at 104.

This alleged conduct suffices to state a claim for deliberate indifference. *See Cosner v. Dodt*, 526 F. App'x 252, 254 (4th Cir. 2013) (deliberate indifference when prisoner swallowed sharp plastic knife and nurse merely checked his vitals, ordered an x-ray three days later, and only sent him to the hospital when he started to bleed five days later). I find that Holness has stated a claim of deliberate indifference against Fraser, Henderson, Lozada, Peek, Wallace, Fritz, and Phillips for failing to get him earlier treatment after he reported swallowing a sharp blade.

### Shaw

Holness alleges that nurse Shaw refused to provide him the inhaler he needed on May 26 or May 27, and that he had to resort to his CPAP for relief as a result. His medical records show that he is prescribed an inhaler for use every four to six hours as needed. Doc. #47 at 100. As alleged, Shaw plausibly had knowledge of Holness's need for an inhaler, but intentionally or recklessly refused to give it to him when he needed it. Given my prior finding that Holness's breathing issues are a serious medical need, I find that he has stated a claim of deliberate indifference against Shaw for withholding his inhaler when he needed it.

<u>*Savoie, Koniecko, Nichols, Wright*</u>

As alleged, Savoie, Koniecko, Nichols, and Wright are not medical staff and did not prevent medical staff from learning of Holness's medical needs nor Holness from accessing treatment. Though many of their alleged comments toward Holness were both cruel and crude, "[i]nsulting or disrespectful comments directed at an inmate generally do not rise to this level [of a constitutional violation]." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003); *see also Webster v. Fischer*, 694 F. Supp. 2d 163, 187 (N.D.N.Y.) ("the mere allegation of verbal abuse, however repugnant it may be, does not rise to the level of a constitutional violation and is not cognizable under 42 U.S.C. § 1983"), *aff'd*, 398 F. App'x 683 (2d Cir. 2010).

Additionally, the allegation that Nichols gave Holness a sandwich with a single piece of hair on it, even if it stopped him from eating during mealtime, is not enough to show a constitutional violation. *See Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (noting that no court has held that a denial of food is a *per se* constitutional violation, but that "a *substantial* deprivation of food may well be" (emphasis added)); *see also Hankerson v. Nassau Cty. Corr. Facility*, 2012 WL 6055019, at *3 (E.D.N.Y. 2012) (prisoner's allegation that he was denied a single meal does not raise a constitutional claim). Any deliberate indifference claims against Savoie, Koniecko, Nichols, and Wright are therefore dismissed.

<u>*Corcella and Cotta*</u>

Holness also alleges that warden Corcella and deputy warden Cotta were told of his grievances but did nothing to remedy them. Although "[a] supervisor may not be held liable under § 1983 merely because his subordinate committed a constitutional tort," the Second Circuit has made clear that "a supervisor may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or

for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002); *see also Raspardo v. Carlone*, 770 F.3d 97, 116-17 (2d Cir. 2014) (extensively discussing supervisory liability requirements under section 1983).

Holness first informed Corcella and Cotta of his mistreatment on May 23. While much of the conduct complained of occurred before then, Holness does allege they "did nothing to get [him] treatment" for his ongoing denial of dental and medical care. Doc. #47 at 19; *see also Grullon v. City of New Haven*, 720 F.3d 133, 140-41 (2d Cir. 2013) (ruling that where a *pro se* prisoner plaintiff alleges that he informed a supervisor about an ongoing and continuing unconstitutional prison condition that the supervisor personally allowed to continue, a claim for supervisory liability may survive dismissal at the Rule 12(b)(6) stage). Thus, a deliberate indifference claim on the basis of supervisory liability may proceed against Corcella and Cotta.

### First Amendment retaliation

In order to establish a First Amendment claim for unlawful retaliation, a plaintiff must prove that he engaged in speech activity that is protected by the First Amendment and that a governmental defendant took adverse action against the plaintiff because of that protected activity. *See Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018); *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). A plaintiff must prove that he suffered an adverse action of sufficient magnitude that it would deter a similarly situated person of ordinary firmness from exercising his First Amendment rights. *See Burns*, 890 F.3d at 93-94; *Wrobel v. Cty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012). The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a

prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dolan*, 794 F.3d at 294. For this reason, a prisoner's First Amendment retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Ibid.*

Holness alleges that some of the defendants retaliated against him for filing this lawsuit against Gagne—a protected activity. *See Davis*, 320 F.3d at 352-53. He alleges potential retaliatory actions committed by the following medical staff: Gagne (asking other mental health staff not to help him); Binezewski (denying him psychiatric medication, placing him on BOS on May 3, and denying him hot meals); Eggen (refusing to help him on May 4 and putting him on BOS on May 17); Torpey (refusing to help him on May 17 and May 28); Placido and King (refusing to help him on May 28); Fraser, Henderson, Lozada, and Peek (refusing to help him during his May 3 to May 6 confinement); Wallace (not addressing the nurses' indifference and not prescribing him pain medication); Fritz and Phillips (refusing to address his pain and bleeding); and Shaw (blocking his access to his inhaler).

Clearly these actions are of sufficient magnitude that they would deter a similarly situated detainee from exercising his First Amendment right to pursue litigation. But for the reasons discussed above, it is implausible that Binezewski and Eggen were retaliating against Holness for this lawsuit. Eggen also did not say anything to suggest that he was retaliating against Holness *because* of the lawsuit. That causal connection is also missing with respect to the alleged conduct of Torpey, Placido, King, Fraser, Henderson, Lozada, Peek, Wallace, and Shaw. Though many of their alleged comments were disturbing, without more, they do not rise from the purely contemptuous to the retaliatory.

Holness does not mention Brennan, Burns, or Faucher in the second section of his amended complaint. He does not allege that Fisher and Menders's delay in treating his dental conditions were similarly out of retaliation. As to Savoie, Koniecko, Nichols, Wright, Corcella, and Cotta, it is implausible that they would also retaliate on behalf of Gagne, who allegedly only asked other medical staff to retaliate for him.

I will permit Holness's claim for First Amendment retaliation to proceed against Gagne, Fritz, and Phillips, and dismiss any retaliation claims against the remaining defendants.

### Excessive force

The Fourteenth Amendment's Due Process Clause "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). A plaintiff may prevail by showing "only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473. The objective reasonableness of the force used depends on four factors: "(1) the need for force, including the threat reasonably perceived by the officer and whether the plaintiff was actively resisting, (2) the relationship between the need and the degree of force used, (3) the extent of the plaintiff's injury, and (4) any effort made by the officer to temper or to limit the amount of force." *Abujayyab v. City of New York*, 2018 WL 3978122, at *6 (S.D.N.Y. 2018) (citing *Edrei v. Maguire*, 892 F.3d 525, 537-38 (2d Cir. 2018)).

Holness alleges that he was strapped to a bed for hours during his time in the RHU. I find that Lt. Koniecko's restraint of Holness was objectively reasonable. In a disciplinary report attached to the amended complaint, Lt. Koniecko noted that he put Holness in a four-point restraint only after he threatened to bang his head against a surface, Doc. #47 at 92, which is behavior consistent with Holness's alleged self-harm ideation and head-banging on May 17.

While he was in restraints, Lozada assessed his condition and noted that his vital signs were stable. Doc. #47 at 97. RN Melissa Brown assessed Holness again during a range-of-motion break. *Id.* at 98. When the restraints were removed, CN Peek also assessed him and found no injury to his wrists or ankles. *Id.* at 99. Any excessive force claim against Lt. Koniecko for restraining Holness in the RHU is dismissed.

### *Conspiracy*

Holness alleges that Wright "acted in conspiracy" by denying his requests to preserve evidence. Doc. #47 at 19. A complaint may not rely on solely conclusory allegations to support a claim of conspiracy. *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) (*per curiam*). I will dismiss Holness's claim of conspiracy against Wright.

### *FOIA*

Holness alleges that Wright failed to respond to his FOIA request and failed to provide the requested documentation and evidence. But the federal FOIA statute only provides for lawsuits against federal agencies, not against state agencies or state officials. *See Geer v. Pheffer*, 2015 WL 332996, at *2 (E.D.N.Y. 2015). Accordingly, Holness has not stated any federal claim against Wright, and I will dismiss Wright from this action. I will otherwise decline at this time to address potential claims under Connecticut's FOIA statute.[3]

---

[3] The Court limits its review for purposes of 28 U.S.C. § 1915A to federal law claims. That is because the core purpose of an initial review order is to make a speedy initial screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If, after an initial review, there are no facially plausible federal law claims against any of the named defendants, then the Court would likely decline to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367. On the other hand, if there are any viable federal law claims that remain, then the validity of any accompanying state law claims may be appropriately addressed in the usual course by way of a motion to dismiss or motion for summary judgment. *See Hamlin v. City of Waterbury, et al.*, 2017 WL 4869116, at *1 n.1 (D. Conn. 2017).

*Motion for preliminary injunctive relief*

On July 17, 2019, Holness moved for a preliminary injunction, Doc. #59, and I denied this motion by docket order on September 25, 2019, Doc. #70. I will now set forth the reasons I denied this motion.

Holness's motion alleges that Wright and Corcella harassed and assaulted him and/or facilitated such harassment and assault, presumably out of retaliation against him for naming them as defendants in his amended complaint. He seeks "a full restraining and/or civil protection order" against Wright and Corcella, Doc. #59 at 1, as well as it seems the return of his CPAP for use during the day, *id.* at 3. I take it that Holness is asking for a temporary restraining order or otherwise a preliminary injunction.

A temporary restraining order is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Reidy*, 477 F. Supp. 2d 472, 474 (D. Conn. 2007) (quoting *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005)). Under Federal Rule of Civil Procedure 65(b)(1), the court may issue an *ex parte* temporary restraining order only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." The legal standard governing the grant of a temporary restraining order is otherwise the same as the standard that governs the grant of a preliminary injunction. *See Vann v. Fisher*, 2011 WL 6788404, at *1 (S.D.N.Y. 2011). Accordingly, a party seeking a temporary restraining order or preliminary injunctive relief "must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance

of equities tips in the party's favor, and that an injunction is in the public interest." *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

As to the requested protection order, Holness has not shown a likelihood of success on the merits or irreparable harm. The tearing up of family photos, though upsetting, is not irreparable harm and in any case is past injury. While Holness does allege that Wright enabled him to assault staff and be assaulted in return, he does not allege that he was forced to do so. His conclusory claim that his mental health issues compelled him to do so is unavailing in light of the medical record he submitted as an exhibit, noting that he told Eggen, "I saw them rip up my photos of my daughter so I grabbed my extension cord." Doc. #64 at 13. It is unclear whether Holness's injured finger was on the hand grasping the extension cord that he was using as a weapon, in which case an inadvertent injury during disarmament could be expected. The bare allegation that Wright told him "it[']s not over" is insufficient to show a likelihood that he would be set up again, choose to assault staff again, and be assaulted in return again.

Additionally, Holness has not shown a likelihood of success on the merits or irreparable harm from the absence of his CPAP. Holness admits he assaulted Wright and other prison staff with an extension cord, which seems to have been part of his CPAP. Doc. #59 at 4. In a grievance attached to his amended complaint, Holness merely alleges that, without his CPAP during daylight hours, he will no longer be able to take afternoon naps. *Id.* at 5. An APRN noted the need for Holness to access his CPAP "on a nightly basis," not at all hours of the day. Doc. #64 at 11. Accordingly, I denied his motion for preliminary injunctive relief.

Lastly, Holness recently notified the Court that he is now housed at New Haven Correctional Center, Doc. #73, thereby rendering his motion for preliminary injunctive relief and any claims for injunctive relief moot. *See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir.

2006) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.").

CONCLUSION

Holness's claims for deliberate indifference to serious medical needs as alleged in his amended complaint shall proceed against defendants Gagne, Brennan, Burns, Faucher, Fisher, Menders, Torpey, Placido, King, Fraser, Henderson, Lozada, Peek, Wallace, Fritz, Phillips, Shaw, Corcella, and Cotta in their individual capacities, subject to their right to challenge whether his *in forma pauperis* status should be revoked and/or to seek dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

Holness's claim for First Amendment retaliation as alleged in his amended complaint shall proceed against defendants Gagne, Fritz, and Phillips in their individual capacities, subject to their right to challenge whether his *in forma pauperis* status should be revoked and/or to seek dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

Holness's remaining claims in the amended complaint are dismissed. Holness's motion for a status report, Doc. #72, regarding the issuance of this initial review order is DENIED as moot.

The Court enters the following orders:

(1) **The Clerk shall** verify the current work address for each defendant with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet to each defendant at the address provided by **December 27, 2019**, and report to the Court on the status of those waiver requests on the thirty-fifth day after mailing. If any defendant fails to return the waiver request, **the Clerk shall** make arrangements for in-person service by the U.S. Marshals Service on the defendant in his or her individual capacity and the defendant shall

22

be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

 (2) **The Clerk shall** send plaintiff a copy of this Order.

 (3) **The Clerk shall** send a courtesy copy of the Amended Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

 (4) The defendants shall file their response to the amended complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above. They also may include any and all additional defenses permitted by the Federal Rules.

 (5) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed by **July 3, 2020**, Discovery requests need not be filed with the Court.

 (6) All motions for summary judgment shall be filed by **August 3, 2020**.

 (7) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

 (8) If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)(2) provides that plaintiff MUST notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of

change of address. Plaintiff should also notify the defendant or the attorney for the defendant of his new address.

(9) Plaintiff shall utilize the Prisoner Efiling Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court. Local court rules provide that discovery requests are not filed with the Court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendants' counsel by regular mail.

It is so ordered.

Dated at New Haven this 6th day of December 2019.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge